Thank you, Your Honor. May it please the Court, Eitan Newman, appearing pro bono on behalf of the petitioner Santos Iraheta-Martinez. I would like to reserve three minutes for rebuttal. In El Salvador, Mr. Iraheta was repeatedly beaten, called homophobic slurs, and whipped with a cable made for beating animals. The IJNBIA assumed that this was past persecution on account of a protected ground, but they failed to apply a presumption of future persecution and shift the burden to the government, as the regulations unambiguously require. Instead, the IJNBIA stated that the burden remained on Mr. Iraheta to show future persecution, and the BIA in turn deferred to the IJNBIA's error and never applied the appropriate de novo standard of review to the ultimate question of whether the government met its burden. The IJNBIA's legal errors themselves require that this Court grant the petition, but they also led to further errors in the agency's review of the record. First, the BIA and the government here rely on the supposed change that Mr. Iraheta is now an adult with a family of his own. But they ignore that this is not a change, because the same was true when Mr. Iraheta was last assaulted and called a homophobic slur by his father in El Salvador. And in fact, Mr. Iraheta's father has continued to call him the slur on the phone since he's been in the United States. Mr. Newman, let me ask you the thing that goes to the center of this case for me. The IJNBIA found, and the BIA affirmed this conclusion, that Mr. Iraheta could relocate safely away from his father in El Salvador. If that finding is true or accurate, put aside possible persecution by his brother or the gangs, doesn't that remove any problem with shifting of burdens and other things with respect to his withholding and cat claims? No, Your Honor, because the BIA was supposed to shift the burden to the government to show that relocation would be unreasonable and to identify a location to which Mr. Iraheta could relocate. Let me ask two questions on that, because I'm not sure I understand. Are you saying that they found relocation was reasonable based on Mr. Iraheta's failure to show that it wasn't? I thought the government introduced country reports, and because the claim in this case was specific to the father, and because we know that Mr. Iraheta is an adult and not required to live with his father, all information the government put in, doesn't that at least suggest he can live someplace else in the country? The government never put in any evidence, Your Honor, and they never even identified, and the BIA case law and this court's case law require the government to meet its burden on relocation to identify either a general or a specific location in El Salvador where Mr. Iraheta could relocate, and they never did so. Is that an argument you make in your appellate briefs? Yes, it is, Your Honor. Let me point you to the page. Because it's not listed, I think, as an error, but maybe I'm wrong. Yes, it starts at page 28 in our opening brief. We specifically reference the matter of MZMR and Singh v. Whitaker, which both require the government to identify a location to which the petitioner could relocate and show that that area is both safe and reasonably accessible to the petitioner, and the government didn't do so here. And moreover, there was no safe location in El Salvador because the evidence that was in the record showed, first, that Mr. Iraheta's father was more than willing to leave his home, go find Mr. Iraheta elsewhere, and drag him to a public place and beat him in a public place. And second, there was evidence from the U.S. State Department report saying that, basically, that relocation in El Salvador is not possible, that there's no freedom of movement in El Salvador, and that gangs prevent people from moving from one location to another. And the government never addressed that information or rebutted it, and in fact, the BIA cited to that information, saying that there is information in the record that relocation is difficult in El Salvador, but then dismissed it out of hand without explaining why Mr. Iraheta could relocate anyway. And I think that itself is enough for the court to grant the petition and remand. I think another, you know, on that point as well, the reason that the burden shifting is important is because when the government identifies a location for relocation, it allows the petitioner to then have an opportunity to rebut that, to provide evidence about why that particular location would not be accessible or would not be safe to him. And in this case, the government never identified any location, general or specific, and so Mr. Iraheta didn't have notice or an opportunity to address that in his own submissions. But as I said before, even the record as it stands now shows that the relocation is not reasonable. I want to also talk about the BIA's CAT analysis, which was also erroneous, and it was erroneous in two respects. First, the BIA disregarded this court's repeated admonitions in Cole, Quijada Aguilar, and most recently in Guerra, that the BIA must consider the risk of torture from all sources in the aggregate. And instead, the BIA considered each source of torture as separate, divisible CAT claims, which this court has repeatedly said is not permissible. And second, the BIA failed to consider more than 150 pages of country conditions documents showing that there are epidemic levels of violence in El Salvador against people who are suspected to be gay, including by government agents, and didn't address that at all in its CAT analysis. I wanted to ask you about that. The claim in this case was that his father or his brother and his associates would persecute him because he was gay, right? The claim wasn't that he would face general persecution because he was gay. The claim was that he would face persecution from his father. He had faced persecution in the past from his father because he was imputed to be gay. Right, yeah, no, there was plenty of evidence of past persecution by the father. I take it that, and therefore there's a presumption of future persecution or maybe even future torture. Now, you challenge, and I'll go back and look at it, you challenge the relocation part of the BIA's decision. But the way I read the decision, and this is why I want you to help me with it, the BIA, while not expressly using the words aggregate, basically said if he relocates, he'll face no real threat from his father. And the threat of harm from his brother and his associates is low. Is that sufficient to show that the aggregate threat is not more likely than not? I know that's a bad sentence, but you know what I meant. I don't think that's sufficient, Your Honor, because the BIA did not identify what level of risk from each actor. Well, but they don't have to use a percentage. They don't have to use a percentage, do they? We've never said the BIA has to say you have a 14 percent risk from your father and a 48 percent risk from the banks, from the banks, on the last case, from the gangs. And therefore, we'll do the formula and figure out whether that's more than 51. The BIA said we think you face no risk from your father if you're relocated. And in doing its withholding analysis, it said we think your risk from the brother gangs, from whom you've not suffered past persecution, so there's no presumption, is rather low. Putting those two together, is that enough for us to discern that they did an aggregate analysis? Or must we require that they actually say so? I think they actually have to say so, Your Honor. And the reason is because we don't know. Your Honor's quite right that the BIA shouldn't have to identify percentages for each particular potential source of torture. But the only reason that they get around that is by considering the entire torture as an aggregate claim. And this court has repeatedly said that they need to do that explicitly. And that when they consider it as separate CAC claims, even if they said separately, in this case there is zero, in this case there is zero percentage of torture, I don't think that would be enough. I think they have to look, the case law is clear, they have to look at the entire universe of potential torture. Are you asking, I just want to make sure I understand what you're, what you think the rule should be. Are you saying essentially a clear statement rule on the face of the BIA opinion there needs to be some clear statement that aggregation was considered? I think so, Your Honor. And I think this court's case law has been clear about that, that when the BIA addresses each claim separately, and that's the language in Cole, when it addresses each claim separately and never considers the torture in the aggregate, that that is an error that requires remand. So are you saying that the word aggregate has to be used? I don't think the word aggregate would have to be used, but I think the BIA would have to say it is not more likely than not that he would suffer torture from any of these sources or any of the sources that would potentially torture him. Well, didn't the BIA say that in the second, first sentence of the second full paragraph of page five of its opinion? I'm sorry, can you point me to the... It's page seven of the administrative record, page five of the BIA's opinion, second full paragraph, first sentence. Did the BIA say exactly what you said? Not exactly, but in essence what you said the BIA has to say? No, I think the BIA there is saying basically that Mr. Ira Hetze has not met his burden to show that... and didn't say anything more. What if the BIA just simply said what that sentence says? That was its entire discussion of whether or not there was an aggregate risk of torture. Would that be sufficient? I don't think that would be sufficient, Your Honor. The BIA has to assess all relevant evidence and determine based on that evidence and based on all potential sources of torture whether it is more likely or not that the petitioner will... Well, see, my concern is this. We do know that they considered all the evidence because they discuss it. They discuss the evidence of risk of torture from his father and risk of torture from the gangs. I understand your argument that they need to aggregate the two. And so, but now, what to me makes the BIA's decision slightly ambiguous is this statement that Judge Feinerman read to you and then the individual discussions that follow it. And so, I'm wondering whether or not we penalize them for being more detailed if the simple statement would have sufficed. And you think it wouldn't because they'd have to somehow indicate that they had done an aggregate analysis in the simple statement. Right. I think the simple statement is basically just a statement that we're denying your claim. But it doesn't say why. And so, the BIA has to go into why and why the risk of aggregate torture from both sources is not enough to meet the standard. Do you want to speak for a minute about your asylum argument? Sure. Your Honor, the asylum statute makes clear that an individual whose circumstances have materially changed since their last entry to the United States has a right to apply for asylum notwithstanding other limitations. And that provision reflects Congress's considered judgment in accordance with treaty obligations and due process that an applicant should have his day in court and should not be denied a new hearing on a new claim that would have been impossible to present previously at a previous opportunity because it had not yet occurred. But the government here argues that it can single-handedly and in its sole discretion reinstate a prior removal order and withhold asylum as punishment for unlawful entry without ever considering the applicant's changed situation. That position is contrary to the statute, to U.S. treaty obligations and to due process, and to this court's prior expectations in Paris Guzman of how the government would treat this kind of case. I think there are three reasons why the statute should be interpreted to allow a person who has suffered changed circumstances since their last entry to retain the right to apply for asylum, even notwithstanding the reinstatement of their prior order. First of all, the specific provision for changed circumstances in the asylum statute shows that Congress explicitly thought about this question, and it outweighs the general prohibition on relief in the reinstatement provision. But the government itself has interpreted it to be porous and to allow all sorts of kinds of relief, including U visas, which are for victims of crime after they have entered the United States. When you respond to the other side's argument that D is maybe a little narrower, and it's actually just an exception carved out from E and C, it shouldn't be read as broadly as you argue. I don't think that's true if you look at the statute as a whole, Your Honor. The statute lays out that any noncitizen, irrespective of their status, has a right to apply for asylum, and it creates some limitations, and it says notwithstanding those limitations, someone can apply for asylum based on changed circumstances. I think the changed circumstances is kind of a reinstatement of the broader right to apply for asylum, if you look at the statute there. And I think that just because it doesn't explicitly identify reinstatement, that it's an exception to the reinstatement bar, does not mean that it shouldn't be read that way, particularly where this court has already allowed other kinds of exceptions to that broad bar. You're almost out of time. I'm happy to give you a minute for rebuttal at the end, and I'll make it a minute and a half if you want to stop now. Sure, thank you. I'll reserve the rest of my time. Good morning. Can you hear me? Hi. We can. Mona Yusuf for the United States. Thank you for taking the time to hear this case. I'm just going to go right in and address some of the issues that opposing counsel has raised. First, he argued that the board and the agency used the wrong burden and didn't shift it to the government to prove a rebuttal of the presumption of a well-founded, I'm sorry, a clear probability of persecution in the future. That's really just not the case. If you look on page 6 of the record, page 4 of the decision, it clearly says the Department of Homeland Security has rebutted the presumption. That makes it pretty clear. And the IJ also in his decision on page 76 of the record, page 5 of his decision, also explained that the burden shifts to DHS. So I believe that the burden was appropriately shifted, so I don't think there's an issue of the burden was improperly placed on the applicant. Ms. Yusuf, could you deal with the relocation burden shifting issue? Yes. Because it seems to me that an important part of the analysis for the agency was that he doesn't face a risk of torture or a very small risk from his father because he can safely relocate. And if that's wrong, then you've got a fundamental problem with the risk of torture analysis. So tell me why your friend is wrong in saying that that finding was not made appropriately. Well, first, in terms of Kat, there is no presumption of future torture. Put aside for a second the level of threat faced by the father. One of the things that allows the agency to, in the end, conclude that there's no reasonable, there's not more likely than not that there's going to be torture is that, well, you can avoid the father by relocating. Yes. Your friend says, well, there's no, that finding was inappropriately made. So if it was, then it seems to me we have to go back and look at the other analysis more closely. So tell me, defend that finding for me, if you would. Well, for the relocation, I believe that the immigration, I'm sorry, the agency probably found that by a preponderance of the evidence in this record, that petitioner is able to relocate. Now, his past persecution by his father was almost solely within the household, on the fields on which they farmed on their household. And perhaps there was one incident when his father dragged him back from a neighborhood location. But when you're able, when you're trying to assess whether or not it'd be possible to relocate, the regulations ask the adjudicator to look at the age, the health, the family ties, whether or not there's civil strife in the country, and the agency did do so. They identified correctly that this gentleman is no longer, he's no longer a young boy who has to live with his father. He left his father in 2005. He's been able to live on his own. He's able to relocate to the United States where there's a different language, a different culture. He's now got a slight, he had a slight college education here. He works construction. He has a wife. He supports his family. Based on that, there's really no reason to suspect that he wouldn't be able to, quote, locate away from his father. Does the, does the, does the relocation decision have to have a specific location in mind? No. According to the case law here under Singh, and I'm not going to pronounce this correctly, it's cited on our 28-J letter, I'm sorry, I can't pronounce it. They say either a specific area or a general area. And in this case, it's a general area. It's basically away from his father. And, in fact, the expert testimony and expert affidavit that the petitioner provided had a study on people who grew up in as we all hopefully do and move away and they were able to avoid harm. So there is the ability to relocate from your parents as an adult to avoid the abuse. And that is on the record here. And that helps support the preponderance of the evidence that he is able to relocate. And that's also. Can I ask you to focus then on the aggregate point? I think our case law is clear. And I think anybody disputes this, that the risk of torture must be considered in the aggregate from all sources. Yes. The BIA didn't expressly conduct an aggregate analysis. It didn't say, as it has in some other cases. I mean, I've seen a number of cases where they say, considering the risk of torture from aggregately from all sources, we find that it's not met. Okay. So tell us how we know it did an aggregate analysis in this case. Well, I will point out one thing is that what the board did was they responded to the arguments raised by petitioner on appeal before the board. And before the board, if you look on pages, I believe, 36 through 39 of the administrative record, those are the arguments where petitioner argued that he qualified for CAT. In that, he didn't argue anything about whether or not he would be imputed to be gay throughout the whole country. He just focused on his father and the gangs. No, I understand. I understand. And I think the aggregate analysis may be limited to dangers from the sources identified below. That's not my question. My question is, how do I know that the BIA aggregated the sources of possible torture from his father on the one hand and his brother and gangs on the other? I think you might have answered your own question when you were questioning petitioner's counsel, in that when the board's decision is basically as to the harm from the father, it was basically said, you can relocate. So really, there's no harm. And actually, they said there's no form of torture, but you're probably going to be harmed. But since you're going to relocate, you're not really going to suffer any harm from your father. So really, there's a 0% chance that he's going to be tortured by his father. Then they went to the analysis. His second argument is that, well, my brother's a gang member. He issued one threat to me over the phone about two years ago. So that means he or his fellow gang members would want to torture me when I get back. The BIA basically found, well, no, that's not really the case here. There's no evidence that you're going to face torture. You're going to be targeted for torture throughout the whole country based on gangs. I think you may be squeezing a little more out of the BIA's decision than is actually there. Okay. The BIA never suggested, and I'm looking at page 5, the second and third full paragraphs. The BIA never said there's 0% chance or kind of suggested there's a 0% chance for the gang and the 0% chance from the father. What the BIA said is the petitioner hasn't established that it's more likely than not that he'll be tortured by his brother or by MS-13 or the next paragraph by his father. So if it had said 0 and 0, then of course we're not going to require the BIA to say, well, 0 plus 0 is 0, and that's less than 50. But it just says less than 50, less than 50. Where can we see, in the opinion, where the BIA actually did the aggregation analysis? I think that's what Judge Hurwitz's question is. It was, and Judge Finerman has phrased it better than I did. So answer his question. No, no, not at all. I mean, yes, I probably misspoke and should have been talking in numbers being an attorney. I try to stay away from it, and I would discourage the court from coming up with a numerical analysis to this. But I think you would have to just read it into the first sentence of that second full paragraph. Basically, it's announcing its intention. We discern no clear error in the immigration judge's factual finding that he has not shown that he were more likely to not be tortured. And then it does address each, well, actually, the applicant's claim is based on a chain of assumptions and a fear of what might happen rather than evidence that meets his burden of demonstrating that it is more likely than not he will be subjected to torture. And I think you could read it into that way, that there's a chain of events you'd have to kind of believe. First, A, dad can find me. B, dad wants to find me. C, dad will find me if I relocate across the country and torture me. Oh, and brother still wants to harm me. He's actually going to be able to track me down, and he will harm me. I think they're talking about that whole link of events there. Does that answer? I was looking at the IJ's decision, and I'm not sure I can find in that something that I'd identify as an aggregate analysis. Is there something in the IJ's decision that you think supports your position? Let's see. I'm not asking you to read it here. I just think I was asking if you had something in mind in the IJ's decision that might be. Go ahead. I'm looking at page 80. As the court finds that a respondent has failed to demonstrate that he has a likelihood to be harmed by his father, his brother, and members of MS-13 upon his removal. So that's what I'd focused on a little bit. That doesn't seem to disaggregate the stuff. It has an and, not an or. I don't know if that's sufficient or not to do the aggregate analysis, but it's the closest I could find in the IJ's order. And I would have to agree with you. I guess it just comes down to the agency is, there's a presumption that the agency considered all the evidence. And in this case, it's a pretty long decision for the BIA generally. And what they did here is it did look like they focused their arguments by addressing the arguments that was raised by Petitioner in his brief before the board. So I think that's why it looks like it might be a two-step analysis instead of an aggregated analysis. But that doesn't, it would be helpful probably if they had done it, but I don't think it would have been required of them to do so. It's like, oh, and we considered in the ad fit this is the case. I think what your argument has to be is that the aggregate analysis is implicit in that first sentence of the second paragraph on page five. Then, of course, the BIA has to go consider the two sources of torture. But the fact that the BIA considered the two sources of torture separately just means that it was doing a thorough job. It doesn't mean that it didn't aggregate them and that you just have to read the aggregation analysis into that first sentence. Yes, thank you, your honor. That's the best way to put it. Thank you. I agree with that. Are there any other questions the court would like me to focus on? Yes, my colleagues, any more questions for the attorney general? I'll ask a question. Did the petitioner exhaust his asylum claim? Well, I don't think he needed to exhaust it because the IJ wasn't authorized to consider asylum because he was put in proceedings through the reinstatement proceedings. And when that's done, the IJ only has the authority to consider withholding and CAT. So what decision of the agency are we reviewing with respect to his asylum claim? Well, I guess it would just be the decision to put him into reinstatement proceedings. Because there is no actual decision saying that he can't apply because he wasn't well, he just wasn't able to apply. The IJ wouldn't, even if he had brought it up, he wouldn't have been able to adjudicate an asylum application. And that's really the best argument against or the best argument really is that his argument is foreclosed. The fact that he can apply for asylum after having had been repeatedly reentering this country and having his removal order reinstated. Are this court's decisions in Perez? I'm sorry. Go back to the exhaustion point. I mean, there are oftentimes people are trying to seek some relief that may be foreclosed if the agency under existing law. But they want to preserve it and argue that they're entitled to some different rule of law. We usually make them at least raise the point before it comes to us. Yes, I mean, I have in the back of my mind that they said there was a decision out there and I can't pinpoint it that exhaustion really isn't. I think the government once tried to raise an exhaustion argument and we failed. So that's why we didn't bring it up here. I mean, it's a tricky situation because there's no decision that says you can't. You can apply for asylum. I mean, I obviously would agree with you would have been nice if you'd raised it for the IJ and IJ would probably have said, well, this is a withholding only proceeding. So I can't even address that issue. And I think the statute makes it very clear. It basically says once your order is reinstated, you have no option for relief of removal and asylum is relief from removal. It's not like withholding and cat. Those are protections. Asylum is purely discretionary. There's no right to asylum. And as this court has explained in its two decisions on the reinstatement cases and who's and Perez Guzman. As soon as you reenter the country and your your removal order is reinstated. I mean, you basically you forfeited your rights to certain forms of relief under these immigration laws. And this particular gentleman has reentered the country, I think, three or four times now. So any claim that I take it you've now we've now taken you over. But I take it your response to Judge Fineman's question and Judge Bress's is that the government doesn't contend that we can't determine in this case the applicability of that statute. No, I don't. I think because because I can't figure out how else he gets it in front of us other than simply being not put into asylum proceedings. Yeah, it's it's a class. I mean, it's not a classic case. There's no decision you can look at other than knowing that DHS put him in. Right. And now he makes an argument that they should have. And you're you're not contesting that we can't consider that argument. I guess you could. But I would argue that that was the case, that it would be an issue of DHS has the discretion to either put him into 40 proceedings or reinstatement proceedings. And there is and that's why you're not right now. Now you're sort of speculating. It's pretty clear in this pretty good. They didn't put him into asylum proceedings because they thought he was ineligible under the statute because of prior removals. They may have been correct, but we get to decide whether they were correct or not. Don't we get the court has that can decide whether or not he met the statutory requirements for being placed in removal. I'm sorry. We can't order them to put him in removal proceedings because they might decide as a discretionary matter not to. But we can review his legal argument. Yes. Yes. And I would argue that for in the brief, I would rely on the arguments in the brief that his legal argument is wrong. And I just want to point out that. Also, remember, fundamental change of circumstances is different than the relocation. So those are alternate findings. So I know I run out of time. Thank you for your time this morning. Thank you for answering our questions. We took you over time. No, no. Thank you, Mr. Newman. You've got some time for rebuttal. Thank you. We'll give you a give them two minutes on the clock, please. Thank you, your honors. Just to point out that Mr. Era had to did raise the issue about asylum to the immigration judge. And she denied his motion to apply for asylum, saying that it was preserved. Where is that? Where is that? Mr. Newman, where are you looking? Yep. Ten twenty five of the administrative record. Thank you. On the cat claim issue, I just want to identify that in the decision, the BIA didn't say that Mr. Era had to have zero chance of harm from his father. In fact, it said, although he may face some harm from his father upon return to El Salvador, it did not rise to more likely than not. And I'm looking at the IJ decision and there's lots of there's a couple of sentences where he uses the word or or I don't know what the IJ uses the word or if it was a man or a woman. Does that does that have some bearing on this analysis? In other words, he says says there's not a he's hasn't shown a reasonable likelihood of terror or more likely than not that he'd be tortured by his father, his brother or the gangs. Is that an aggregate analysis or is that an individual analysis? First of all, I think this court has to review the BIA's decision, not the IJ's, because the BIA took its own look at this question and analyzed each of. Well, but it did say the reasons identified by the IJ, we find that he's not more likely than not. So it seems to me we can look at the at the IJ's analysis, can't we? I think because the BIA laid out its own reasoning here that the court then has to review the BIA's decision, not the IJ's. But even if the court were to review the IJ's, I don't think that that's that the or language is enough because the the IJ did not consider whether Mr. Ira had to would suffer harm from other people in El Salvador, including public officials who have been shown to systemically harm people who are considered to be gay. And the the case law states that the IJ and the BIA have to consider all evidence in the record, regardless of whether it's specifically brought up by the petitioner. But in this case, it actually was in our in our brief before the the board. We did actually identify that Mr. Ira had to face harm by others in El Salvador because of who might consider him to be gay. And that is I believe it's page twenty seven of the administrative record. And so so this was brought up before the BIA and the BIA just totally ignored that evidence in the record, which it cannot do. Mr. Newing, before you close, I see I went to page one zero two five on the exhaustion point on the asylum issue was the and I see exactly what you're referring to. Was that was this issue then raised to the BIA? It was your honor. And I don't have the exact citation here of where that was. Is it in your client's BIA brief? It's in the brief. Yes. I believe it might have been in a footnote, but it is preserved. And, you know, to the extent again, I would also state that to the extent the court is wants to avoid this question of whether someone in reinstatement can can apply for asylum in these circumstances. You know, we Mr. Iroha has also submitted a motion to reopen based on his in absentia order. And of course, as the court knows, the government opposed our motion to hold this case in advance for that. And this court ultimately denied the motion to hold in advance. But I think, you know, if if the court wanted to avoid this question, it's very possible that Mr. Iroha underlying removal proceedings could be reopened and then this this entire question would go away. So what's the status? What's the status of that motion? That motion is still pending at the BIA. Is there a date scheduled for its disposition through oral argument or otherwise? No, not that I know of. OK, I think we've taken taking you over to I thank both counsel for their arguments and briefing in this case. I thank Mr. Newman for his his and his firm's pro bono efforts. This court really appreciates that. And this case will be submitted.
judges: Hurwitz, Feinerman, Bress